IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-00390-PAB-MEH

CHRISTOPHER JOE CLARK,

     Plaintiff,

v.

JONATHAN COLE MURCH, Police Officer for the City of Durango,
JUSTIN MOORE, Police Officer for the City of Durango,
CONNER LOWANDE, Police Officer for the City of Durango,
WILLIAM VANCE DAVIS, Police Officer for the City of Durango,
SEAN MURRAY, Deputy District Attorney for the Sixth Judicial District,
ZACHERY ROGERS, Deputy District Attorney for the Sixth Judicial District, and
CHRISTIAN CHAMPAGNE, District Attorney for the Sixth Judicial District,

     Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Michael E. Hegarty, United States Magistrate Judge**.

     Before the Court are the Motion to Dismiss (ECF 66) filed by those individuals who had prosecutorial roles in the underlying criminal case (the "Prosecutor Defendants) and the Motion to Dismiss (ECF 71) filed by those individual police officers who investigated the crime and arrested Plaintiff (the "Law Enforcement Defendants"). The Motions are fully briefed, and the Court finds that oral argument will not materially assist in their adjudication. Also before the Court is Plaintiff's Motion Requesting the Court to Take Judicial Notice. ECF 102. For the following reasons, I respectfully recommend that all three Motions be granted.

## BACKGROUND

### I.   Documentary Evidence

"Generally, the sufficiency of a complaint must rest on its contents alone." *Gee v. Pacheco,* 627 F.3d 1178, 1186 (10th Cir.2010). There are limited exceptions to this general rule by which a court may consider materials beyond the four corners of the complaint. *Id.* These three exceptions are: "(1) documents that the complaint incorporates by reference; (2) documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity; and (3) matters of which a court may take judicial notice." *Id.* (internal citations and quotations omitted). A court may consider such documents without converting a motion to dismiss into a motion for summary judgment. *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (permitting a court to take judicial notice of facts that are a matters of public record).

The Court includes in the present Rule 12(b)(6) analysis documents that the Law Enforcement Defendants attach to their Motion to Dismiss (ECF 71). They are documents that Plaintiff discusses in his pleadings and are central to his theory of false arrest and malicious prosecution. Their authenticity is undisputed. *N.E.L. v. Gildner*, 780 F. App'x 567, 571 (10th Cir. 2019).

Because they are central to Plaintiff's claims and establish the context of what happened, the Court addresses them first. Moreover, the Court conducts its own independent review of the documents' contents to alleviate the concern Plaintiff raises in his Motion Requesting the Court to Take Judicial Notice (ECF 102) that the Law Enforcement Defendants misrepresent them in their Motion to Dismiss.

2

<u>Officer Murch's Investigation Narrative Report</u>

Defendant Officer Murch ("Officer Murch") recounted the night's events. The victim had called police about "an armed robbery that had just occurred at 22:22 hours." ECF 71-1 at 1. Officer Murch arrived on scene and spoke with the victim. The victim reported that while he walked in an alleyway to his car, "a white male with a short beard wearing all black [had] approached him and asked him for money." The assailant was "thirty or forty years old" and "was definitely a transient." The victim believed "he could identify the male if he saw him again." *Id*.

The assailant persisted in asking for money in a way that made the victim nervous. When the victim sat down in his car, the assailant "brandish[ed] a large knife," "sw[u]ng it at the driver's window," and dragged "it down the glass." The victim drove off and called the police. The victim was neither physically injured, nor did the assailant steal anything. *Id*.

Officer Murch responded to the scene and spoke with the victim. He created "a perimeter for other officers to fill," made "numerous announcements" from the patrol car's public speaker to persuade the assailant to turn himself in, and joined "Officer Moore on the K9 track." He and Defendant Officer Justin Moore ("Officer Moore") were unable to locate the suspect during their search of the scene. *Id*.

Along with other officers, Officer Murch left the immediate area and went on patrol. Officer Murch approached a male "wearing all black clothing." That person–the Plaintiff–identified himself and explained that he "was just out walking," having left a hotel after fighting with his girlfriend. Officer Murch took a photo of the knife Plaintiff had in his back pocket and of Plaintiff himself. *Id*.

3

Officer Murch returned to the victim and showed him the photographs. The victim recognized Plaintiff as the assailant and the knife as the weapon used. The victim also wanted to press charges against Plaintiff. *Id*. at 1-2.

Officer Murch arrested Plaintiff that night for aggravated robbery. While en route to the jail, Plaintiff "became belligerent and aggressive" and "began to threaten" Officer Murch. *Id*.

Officer Murch's report contains additional information about Plaintiff. He has numerous felony convictions, and he was a suspect in a menacing case two months earlier in the same area.[1] The day before the arrest here, Officer Murch and Officer Moore had responded to the hotel room where Plaintiff and his girlfriend were staying after the girlfriend's mother called police with concern for her daughter's safety. They observed no disturbance at the hotel room upon their arrival, and consequently, they took no action against Plaintiff. *Id*.

<u>Officer Moore's Supplemental Narrative Report</u>

Officer Moore wrote that on the night of March 3, 2019, he responded to a dispatch call about a robbery committed by "a white male, in his 40's or late 30's, wearing all black [and] armed with a knife." ECF 71-2 at 1. Officer Moore was posted at the north side of the perimeter until Defendant Officer William Vance Davis ("Officer Davis") replaced him. *Id*.

Officer Moore left the perimeter to speak with the victim. The victim described the assailant as a male wearing "a big puffy black jacket." Officer Moore showed the victim a photograph of another suspect (not Plaintiff), but the victim did not recognize that person. *Id*.

Officer Moore's several different attempts to locate the assailant in the immediate area were unsuccessful. The responding officers stopped their search efforts. *Id*.

---

[1]  It was explained at the Preliminary Hearing that Plaintiff was a suspect in that prior attempted robbery/menacing investigation, but ultimately, he was not charged. ECF 71-5 at 17-19, 41.

Two hours later, Officer Moore heard that Officer Murch and Defendant Conner Lowande ("Officer Lowande") had encountered a suspect who resembled the assailant's description. The suspect was identified as Plaintiff, and Officer Griffith (not named as a Defendant) informed them that he was a suspect in a menacing case in January involving a knife and demand for money. *Id*. at 1-2.

Officer Moore went to the scene. He and Officer Lowande stayed with Plaintiff while Officer Murch left to speak with the victim. Plaintiff was not in handcuffs, and he sang while wearing headphones as they waited on Officer Murch. *Id*. at 2.

Officer Moore and Officer Lowande placed Plaintiff in custody after Officer Murch reported that the victim had identified Plaintiff as the assailant. Plaintiff protested. He had just left the hotel, he maintained, and his movements could be tracked. He believed that he was being arrested solely on the basis of his criminal record. He initially resisted being placed in the patrol car but later complied. Officer Murch drove Plaintiff to the jail. *Id*.

<u>Officer Lowande's Supplemental Narrative Report</u>

Officer Lowande wrote that he responded to a dispatch call about an attempted robbery involving a male suspect "wearing all black" who used a knife. ECF 71-3 at 1. Upon arrival at the scene, Officer Lowande was posted to the southern side of the perimeter. *Id*.

Officer Lowande then left the perimeter, and together with Officer Murch, he patrolled further away. That was when they encountered "a male wearing all black walking down the road." They identified the person as Plaintiff. Plaintiff denied robbing anyone and explained that he was out "just walking." When asked if he had a knife on him, he answered that he had a box cutter device. Photographs of Plaintiff and the knife were taken. *Id*.

Officer Lowande stayed with Plaintiff while Officer Murch contacted the victim. When Officer Murch reported the victim's positive identification of Plaintiff, Officer Moore and Officer Lowande placed him in custody. Plaintiff became uncooperative and "began cursing profane words towards" them both. *Id*.

### Officer Davis' Probable Cause Affidavit

Later on the day of Plaintiff's arrest, Officer Davis wrote an Affidavit of Probable Cause Subsequent to Warrantless Arrest. ECF 71-4. He based the probable cause statement on information relayed to him by Officer Murch. *Id*. Officer Davis' description of the events that precipitated Plaintiff's arrest is consistent with the officers' individual reports.

### Preliminary Hearing

A Preliminary Hearing took place on April 26, 2019 at which Defendant Sean Murray ("Mr. Murray") appeared as the prosecutor and Christian Izaguirre as Plaintiff's defense attorney. ECF 71-5 at 1. At the hearing, the victim's 9-1-1 call and Officer Murch's body camera video were played. *Id*. at 3. Officer Murch testified, and his testimony provides additional details about how the victim described the attempted robbery.

The first matter concerns the victim's description of the assailant's weapon. The victim told him that a white male had asked for money in an aggressive fashion. After the victim sat in his car, he saw the assailant swipe something metallic such as a knife, bar, or flashlight. He described the object as black and hard. Initially, the victim did not definitively state it was a knife. *Id*. at 7, 20-21. Officer Murch then asked the victim: "[a]nd that's when he pulled out the knife[?]" *Id*. at 21. Possibly Officer Murch thereby established as a detail that the object used indeed was a knife. At the Preliminary Hearing, Plaintiff complained that Officer Murch's question also could have suggested to the victim that the object used was a weapon. *Id*. at 46.

Another point of inquiry concerned exactly what the victim did with the object. Officer Murch conceded that the victim did not actually say the assailant had scratched his car window or windshield. Indeed, Officer Murch saw no damage to the glass. *Id*. at 21-24. Nor did the victim report seeing a knife blade. *Id*. at 22.

The victim told Officer Murch that a homeless or vagrant man had asked him for money, initially in a non-threatening manner. *Id*. at 22-23. The victim was unsure if the person was just panhandling for money or intended to assault him. *Id*. at 24. The assailant then became aggressive and began to bang on the car window. *Id*. at 24. At that point, the victim "freaked out and peeled out of the alley." *Id*. at 7.

The victim described the assailant as thirty to forty years old. *Id*. at 8. The victim left the encounter believing that "he could possibly identify him if he saw him again." *Id*. at 8.

Later at 12:20 a.m. that night, Officer Murch saw Plaintiff walking along Main Ave. *Id*. at 9. Already that night, law enforcement had stopped three or four others as they searched for the assailant. *Id*. at 26.

Plaintiff was wearing a black winter jacket that was not "overly puffy." *Id*. at 9-10. Plaintiff was forty years old at the time. *Id*. at 11. Plaintiff denied any involvement in the attempted robbery. He and his girlfriend were arguing, he explained, and he had left for a walk to diffuse the situation. *Id*. at 12. Plaintiff had a box cutter in his back pocket. *Id*. at 25.

Officer Murch returned to speak with the victim. The photographs of Plaintiff and his box cutter were the only items that Officer Murch showed the victim. *Id*. at 26-27. The victim identified the photographed person as the assailant. The victim also recognized the knife. The victim made the identification without prompting or hesitation. The victim felt eighty to ninety percent sure. *Id*. at 14. Earlier that night, the victim had eliminated another person as a suspect.

*Id*. at 15. The victim positively identified no others. *Id*. at 29. The Court notes that there is no body camera recording of this particular interaction. *Id*. at 27.

The victim also testified at the Preliminary Hearing. He recalled a man approaching him in an alley in "a typical panhandling . . . attempt to solicit for money." Initially, he did not feel threatened, but the person became upset. He banged on the window "trying to break it" with the hilt of either a knife (which is what the victim assumed it to be) or possibly a flashlight. The object was black in color and hard. At the same time, the assailant cursed at him with profanities. The entire episode lasted ten to fifteen seconds. *Id*. at 31-35, 40. The victim's focus during that episode was more on the assailant's fist and the object hitting the glass than on the object's other end (where the blade would be). *Id*. at 34. He did not see a blade of any kind. *Id*. at 35.

The victim was concerned about the window breaking, and he was not sure if the assailant's intention was only to cause property damage or to assault him personally. He was scared, and as the assailant wound back to make another hit, the victim pulled away. *Id*. at 39. The victim drove out of the alley, but he quickly stopped twenty to thirty yards away to call the police. The police arrived within a minute. *Id*. at 35-36. The first photograph he was shown was not the assailant. *Id*. at 38.

Later that night, the police returned to show the victim the photographs of Plaintiff and his knife (which the victim described as a "black handled fold-out box knife"). *Id*. at 37. Before showing the victim the photographs, the officer said, "[w]e believe that this is the perpetrator," or something to the effect that a person was in custody who fits the description. *Id*. at 37. Plaintiff argued at the Preliminary Hearing that the officer's prefatory comment was improperly suggestive. *Id*. at 46. From the witness stand at the Preliminary Hearing, the victim identified Plaintiff as the person who attacked him. *Id*. at 40.

The state court saw an insufficient basis to proceed with a charge of aggravated robbery because of the weak relationship between the assailant's act of panhandling and the subsequent attack on the victim's car. *Id.* at 45, 50. However, the state court did see an aggressive use of a weapon that reasonably could have created fear of serious bodily injury, and on that basis, the state court found probable cause of the crime of menacing. *Id.* at 46-47, 51.

### Motion to Suppress Hearing

The state court held a hearing on Plaintiff's motion to suppress on July 30, 2019. ECF 71-6. Mr. Murray and Defendant Zachary Rogers ("Mr. Rogers") were the prosecutors, and Mr. Eley was Plaintiff's defense attorney. *Id.* at 1. At issue was whether the victim identified Plaintiff as his assailant after an unreasonably suggestive prompting.

The victim recalled that law enforcement first had "presented a single photograph of someone that they maybe already suspected or were looking for." *Id.* at 5. The person in that photograph had a lot of facial hair, but the assailant had either no facial hair at all or none to that extent. *Id.* at 21. He said the photographed person was not the assailant. (Later during the hearing, Officer Moore testified that it was he who showed him the photograph of someone he believed matched the assailant's description and who is known to carry a knife. *Id.* at 48.)

Law enforcement returned with a different photograph and asked him "essentially, do I think this was the individual or something to that effect[?]," to which the victim answered yes. *Id.* at 5-6. The victim denied hearing any prompting or other "qualifying statements" (*id.* at 14, 23), although neither did he remember exactly what was said (*id.* at 15, 23). The victim could not remember if law enforcement had said, "[w]e're pretty sure we got the guy. Is this him?" before showing Plaintiff's photograph. *Id.* at 24.

The victim felt very certain that the photographed person was the assailant and that the

photographed knife was the object the assailant "wielded in his assault on my vehicle." *Id*. at 9. The victim recalled seeing in the assailant's hand a dark-colored object resembling the hilt of a knife or some other tool that was hard, possibly plastic. *Id*. at 12.

The victim described the setting of the assault: It occurred in an alley at night but illuminated by nearby businesses and a greenhouse on his own property. *Id*. at 8, 18. (Officer Murch also remembered good lighting in the area. *Id*. at 36-37.) Although brief in duration, he interacted with the assailant directly and at close quarters. Given the situation of strange man approaching him late at night in an alley, his focus was on the person and making his way to his car. *Id*. at 16-17. The victim again looked directly into the assailant's face at very close distance through car's driver-side window. *Id*. at 19-20.

The victim described the assailant to law enforcement as a white male in his early forties to early fifties. He was wearing either a puffy jacket or hoodie of dark color. *Id*. at 21-22.

Officer Murch testified at the hearing. He recalled the victim describing the assailant "as a white male, 30 to 40 years old, wearing all black." *Id*. at 28. About two hours after speaking with the victim, Officer Murch saw a person who met the assailant's description. *Id*. at 32.

Officer Murch does not remember what he said to the victim before he showed him Plaintiff's photograph. *Id*. at 34. The victim identified Plaintiff as the assailant without hesitation. *Id*. at 39. After Officer Murch informed him of the severity of the crime and the need for certainty, the victim affirmed the identification. *Id*. at 35.

After his body camera video was played at the hearing to refresh his memory, Officer Murch recalled the victim's description if the assailant as having facial hair and not clean-cut (although Plaintiff in fact was clean-cut on the night of the encounter). *Id*. at 42. When the victim said he was not sure whether the assailant was holding a flashlight or knife, Officer Murch told

the victim that it was a knife. *Id*. at 42-43.

Officer Moore testified at the hearing. He remembered Plaintiff wearing "a black jacket[,] a heavy hoodie or a big jacket." *Id*. at 48-49.

The transcript does not contain the court's ruling on the suppression motion. Nor does the record contain any orders from the criminal case that show how it ended. Plaintiff represents that the criminal case was resolved in his favor. *Id*. at 11. Plaintiff says that the court gave Mr. Murray until August 31, 2019 to resolve the case or else the jury trial would begin on September 3, 2019. On August 31, 2019, the court granted Mr. Murray's motion to dismiss the charges. *Id*. at 22.

<u>Body Camera Videos</u>

The Law Enforcement Defendants submit into the record the body camera video recordings of Officer Murch and Officer Lowande. However, they do not provide a transcript of them. Plaintiff provides his own unofficial recitation of the recorded exchanges, which the Court uses for purposes of this ruling.

According to Plaintiff, Officer Murch's body camera recorded the victim as describing the assailant as "older probably . . . maybe late thirties early forties." The assailant "[p]robably [has] some facial hair" and "definitely not very clean cut," but without a beard. The victim described the assailant's clothes as a pretty big, black, "poufy" jacket, possibly with a hood attached but not up. The assailant might have been wearing something else on his head other than the jacket's hoodie. *Id*. at 12-13.

Plaintiff provides a statement of what Officer Moore's body camera recorded when he showed the photograph of another suspect to the victim. According to Plaintiff, the victim did not recognize that person, explaining:

It's hard to tell. Um, I don't recall his beard being quite that long. He definitely wasn't clean cut, it was dark. I didn't get a real good look at him, but I think he's Caucasian and definitely from the way he was talking to me, he didn't have an . . . accent or anything like that.

*Id*. at 13.

Plaintiff also recounts a radio conversation between Officer Griffith (whose location at that time is unknown) and Officer Lowande (who, along with Officer Murch, was with Plaintiff). Plaintiff's recitation begins with Officer Griffith informing the officers at the scene that Plaintiff is a suspect in a menacing case from January 16 in which a knife was used to take someone's wallet. Officer Griffith next asks if the officers "have enough P.C. for a warrant?" Officer Lowande answers "No," but he felt he had enough to hold Plaintiff temporarily to allow Officer Murch time to show the victim the photographs. *Id*. at 14.

## II.    Plaintiff's Allegations

Having used the documentary evidence to establish the context of Plaintiff's claims of wrongdoing, the Court turns next to his allegations. For purposes of this ruling, the Court accepts as true the factual allegations—but not any legal conclusions, bare assertions, or conclusory allegations—that Plaintiff raises in his Third Amended Complaint (ECF 49). *See generally Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (accepting as true a plaintiff's factual allegations for purposes of Fed. R. Civ. P. 12(b)(6) analysis).

<u>The Law Enforcement Defendants</u>

Plaintiff alleges that Officer Murch deliberately showed the photos in an improperly suggestive way to persuade the victim and obtain a false identification. Plaintiff adds that Officer Murch purposely turned his body camera off when he showed the victim the photographs. Plaintiff cites from Officer Murch's body camera recording after the visit when Officer Murch

realized, "[o]h no, forgot to turn my camera on, on that!" and explained, "I forgot to turn my camera on that. At the beginning of this call, sorry." *Id.* at 10. Officer Murch then left the camera on for twenty-five minutes while he filled out paperwork. Plaintiff disbelieves that Officer Murch accidently turned his camera off for the visit. Instead, he accuses Officer Murch of purposely not recording his effort to obtain a false identification from the victim. *Id.*

Plaintiff concedes that he was wearing dark clothing and was in his early forties at the time. *Id.* at 14. However, he otherwise denies matching the assailant's description whom the victim said had a short beard and was not clean cut. That night, he was clean shaven, was wearing clean clothes, and did not look "transient," Plaintiff asserts. *Id.* Nor was he wearing the same *type* of clothes as described, even if his clothes were dark in color. *Id.*

Plaintiff contends that the radio conversation between Officer Griffith and Officer Lowande demonstrates how the officers themselves saw no probable cause. That motivated them to send Officer Murch to show the victim the photographs to manufacture evidence. *Id.*

Plaintiff furthers that Officers Murch, Moore, and Lowande fabricated evidence with malicious intent and arrested him despite knowing he had committed no crime. *Id.* at 15. He says that after he was arrested and placed in the patrol car:

> Defendants Murch, Moore, and Lowande all muted their body cams and [held] a discussion which consist[ed] of animated laughter for approximately, 3 minutes and 5 seconds. (Moore's Body cam time 06:54-10:01).

*Id.* at 16.

Plaintiff accuses Officer Davis of swearing "to false statements on an affidavit for a warrantless arrest," (*id.* at 17), in reference to the Affidavit of Probable Cause Subsequent to Warrantless Arrest. Plaintiff accuses Officer Davis of both not investigating the matter on his own and to making false statements knowingly and recklessly. *Id.* The affidavit that Officer

13

Davis wrote therefore was another act that caused his continued confinement and criminal prosecution despite the lack of probable cause. *Id*. at 18. Plaintiff accuses Officer Murch and Officer Moore of "testif[ying] to the false reports" at the two court hearings. *Id*. at 26.

Plaintiff asserts that he "had not engaged in violent activity in the area." *Id*. at 26. He concedes that upon his arrest, he became upset and refused to walk to the patrol car. However, he denies being aggressive generally or threatening Officer Murch. *Id*.

<u>The Prosecutor Defendants</u>

Mr. Murray and Mr. Rogers were prosecutors who Plaintiff alleges "instituted groundless criminal proceedings against [him]." *Id*. at 19. Plaintiff says that Mr. Murray created a false case against him in several different ways: First, he helped Officer Murch resolve "the extreme differences" between his report and what his body camera had recorded the victim as saying. Second, Mr. Murray knew Officer Murch's report was false after reviewing the body camera recordings himself. Third, Mr. Murray used the Preliminary Hearing to submit false evidence into the record to mislead the state court into finding probable cause. Fourth, Mr. Murray told the state court that Plaintiff was a suspect for an act of menacing two months earlier in January despite knowing the victim did not identify him during that investigation. Fifth, Mr. Murray wrongly raised to the state court a "doctrine of chance" argument to create the implication of guilt from being a suspect in two similar crimes (although Plaintiff also concedes the state court's rejection of that argument). Sixth, Plaintiff objects to Mr. Murray's inclusion of a robbery charge that elevated the nature of the criminal proceeding beyond what a menacing charge alone would warrant. Seventh, Plaintiff accuses Mr. Murray of coaching the victim or otherwise improperly soliciting from him testimony at the Suppression Hearing that was favorable to the prosecution's case. *Id*. at 20-21.

14

Plaintiff alleges that Mr. Murray persisted in the criminal case and his continued detention despite being told by his defense attorney "on multiple occasions that Plaintiff did not commit this crime and didn't even fit the description of the assailant." *Id*. at 22. Mr. Murray's reputation is for holding criminal defendants in pre-trial detention for as long as possible and waiting until the last minute to dismiss charges. *Id*.

Plaintiff expands the allegation to say that both Mr. Murray and Mr. Rogers persisted in the criminal prosecution despite knowing the entire time that Plaintiff was innocent. Plaintiff adds that the prosecutors refused to investigate his alibi. *Id*. at 23.

As against Defendant Christian Champagne ("Mr. Champagne"), Plaintiff alleges that he failed to train and supervise Mr. Murray and Mr. Rogers and thereby prevent his "groundless and frivolous" prosecution. Evidently, Plaintiff actually spoke with Mr. Murray in person after the criminal case's dismissal. According to Plaintiff, Mr. Murray explained to him that it was Mr. Champagne's advice to take the case to trial but that Mr. Murray overruled that instruction and dismissed the charges. *Id*. at 29. Consequently, Plaintiff believes that Mr. Champagne "had a larger role in [his] prosecution." *Id*. at 30.

## III.    Claims for Relief

Plaintiff brings suit under 42 U.S.C. § 1983 seeking redress for violations of his Fourth and Fourteenth Amendment rights. As against the Law Enforcement Defendants, his theory of wrongdoing can be summarized as the use of falsified evidence to manufacture probable cause to arrest him (false arrest) and by extension to continue his confinement (false imprisonment) and to support the criminal action against him (malicious prosecution). As against the Prosecutor Defendants, he claims malicious prosecution. Lastly, he alleges violations of his constitutional rights to due process and a fair trial.

## LEGAL STANDARDS

### I.      Rule 12(b)(6)

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleads facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. *Twombly* requires a two-prong analysis. First, a court must exclude "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Iqbal*, 556 U.S. at 679–80. Second, a court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the well-pleaded averments state a plausible claim for relief, then it survives a motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)). "The plausibility standard does not require a showing of probability that 'a defendant has acted unlawfully,' but

requires more than 'a sheer possibility.'" *Parshall v. Health Food Assocs., Inc.*, No. 14-4005-JAR, 2014 WL 2547761, at *1 (D. Kan. June 5, 2014). While the Rule 12(b)(6) standard does not require that a plaintiff establish a *prima facie* case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id.*

## II.     Treatment of a *Pro Se* Complaint

A federal court must construe a *pro se* plaintiff's "pleadings liberally, applying a less stringent standard than is applicable to pleadings filed by lawyers." *Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997). The Tenth Circuit interprets this rule to mean that if a court "can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, that

does not mean that a court should "assume the role of advocate for the *pro se* litigant." *Id.* A court will not assume fact allegations that have not been pleaded or construct a legal theory on the plaintiff's behalf to round out the complaint. *Peterson v. Shanks*, 149 F.3d 1140, 1143 (10th Cir. 1998).

## III.    Qualified Immunity

Qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly violative at the time of the official's actions. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It "protects all but the plainly incompetent or those who knowingly violate the law." *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018) (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). The privilege is an entitlement not to stand trial or face the other burdens of litigation, and thus, it is immunity from being sued rather than a defense to liability. *Ahmed v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006). Qualified immunity exists if (1) the law enforcement officer's actions violated a constitutional or statutory right and (2) the right was clearly established at the time of the officer's conduct. *Harris*, 838 F. App'x at 342.

For a right to be "clearly established," its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016). A plaintiff "typically must identify 'an on-point Supreme Court or published Tenth Circuit decision,' but also may look to the 'weight of authority' from other courts." *Harris*, 838 F. App'x at 342. The clearly established right must be "particularized to the facts of the case" and should not be defined "at a high level of generality," *id*., especially in the excessive force context, *City of Escondido v. Emmons*, 139 S.Ct. 500, 503 (2019). However, a case directly on point is not required so long as existing precedent has placed

the statutory or constitutional question beyond debate. *A.N. v. Syling*, 928 F.3d 1191, 1197 (10th Cir. 2019). A general statement of the law can establish a right for qualified immunity purposes if it applies with obvious clarity to the specific conduct in question. *Ramirez v. Reddish*, No. 18-cv-00176-DME, 2020 WL 1955366, at *4 (D. Utah April 23, 2020). "A general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Courts have the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

**DISCUSSION**

## I.      Probable Cause

The existence of probable cause defeats claims of false arrest, *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012), false imprisonment, *Cook v. Whyde*, No. 20-cv-02912-PAB-STV, 2021 WL 4459051, at *9 (D. Colo. Sept. 29, 2021), and malicious prosecution, *Agustin v. Gagliardi*, No. 18-cv-02646-MEH, 2022 WL 19424, at *17 (D. Colo. Jan. 3, 2022). Consequently, if the Law Enforcement Defendants had probable cause to arrest Plaintiff, then all of his claims against them fail. Probable cause existed if the facts and circumstances available at the time of arrest showed a substantial probability that Plaintiff had committed a criminal offense. The test for probable cause is an objective one. If there is no dispute over the material facts (as here), then a court may determine as a matter of law whether a

19

reasonable officer would have found probable cause under the circumstances. *Agustin*, 2022 WL 19424 at *17 (citing Tenth Circuit case law). Moreover, the law permits one officer to rely on a fellow officer's probable cause determination. *U.S. v. Chavez*, 534 F.3d 1338, 1348 (10th Cir. 2008).

To begin with, the state court that presided over the criminal case already found probable cause of the crime of menacing and heard Plaintiff's objection to how the photographs were presented to the victim. Because the state court already ruled on those matters and because that criminal case has concluded, the *Rooker-Feldman* doctrine prevents this federal court from revisiting them. *Kirchner v. Marshall*, No. 20-cv-00114-MEH, 2021 WL 243448, at *5 (D. Colo. Jan. 25, 2021) (discussing *Rooker-Feldman* abstention). Even if the prosecutors had submitted false evidence to support probable cause, Plaintiff was present at the hearing, and he was represented by counsel who had the opportunity to–and actually did–test the prosecution's case. Plaintiff may not re-argue those same matters to this federal court.

Nevertheless, even if this Court were to undertake its own *de novo* consideration, it also would find the existence of probable cause. The victim directly engaged with his assailant at close quarters. The Law Enforcement Defendants responded to the scene within minutes, and through both his 9-1-1 call and in person, the victim gave a description of his assailant and the object used to bang against his driver-side window. Just two hours later, the Law Enforcement Defendants stopped Plaintiff. Plaintiff broadly met the description: a middle-aged adult white male wearing a black jacket. Moreover, he had in his position a box cutter device that generally resembled a knife or flashlight and of the reported color.

Plaintiff places much emphasis on the fact that he was clean shaven at the time. However, the victim said his assailant did not have full beard while leaving ambiguous the possibility of

some facial hair. Whether Plaintiff looked "transient" is too subjective point to make a difference. In overall terms, Plaintiff resembled the description. The law does not require an exact match, just a "fair resemblance." *U.S. v. Carpenter*, 342 F.3d 812, 814-15 (7th Cir. 2003); *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1265 (8th Cir. 1996). Plaintiff also was found on foot, relatively nearby, close in time to the assault, and at a time of night when few people are out and about. Not only did those greater circumstances create a reasonable suspicion, but the Law Enforcement Defendants knew that Plaintiff was a suspect in an investigation of a similar act of menacing just two months earlier.

The Law Enforcement Defendants acted on more than just their own judgment of whether Plaintiff resembled the description of the assailant (and weapon used). They also had the benefit of the victim's own review of the photographs of Plaintiff and the object (taken just two hours after the assault). Plaintiff places much emphasis on what he considers to be an overly suggestive presentation of the photographs to sway the victim towards identifying him as the assailant. The dispositive factor governing identification evidence is reliability and whether under the totality of the circumstances there was a substantial likelihood of irreparable misidentification. *U.S. v. Thody*, 978 F.2d 625, 629 (10th Cir. 1992). None of the circumstances here call the reliability of the victim's identification into significant doubt. The victim saw the assailant directly and at close quarters. The Law Enforcement Defendants showed the victim a photograph of Plaintiff and the box cutter knife found on him that were taken very soon after the assault. The victim quickly recognized both, and he remained confident in the identification after being reminded of the seriousness of the inquiry. Plaintiff contends that Officer Murch showed him the photographs in a suggestive way. The victim, himself, denied any prompting. Regardless of how Officer Murch presented the photographs, the setting alone–Officer Murch's return to the

victim's home two hours after the assault with photographs taken just minutes before–itself implied the nature of the inquiry: to ask whether the photographed person was the assailant. The Court discerns nothing unreasonable in the undertaking or that would have improperly swayed or affected the victim's opinion. Indeed, the victim already had rejected a photograph of another suspect.

Plaintiff stresses how at one point during that night's investigation, the Law Enforcement Defendants did *not* believe they had probable cause to arrest Plaintiff. What the officers subjectively perceived is irrelevant to the probable cause analysis. *Koch v. City of Del City*, 660 F.3d 1228, 1239 (10th Cir. 2011). Nevertheless, even if probable cause was lacking at that particular point in the investigation, the victim's subsequent positive identification of the victim and weapon was sufficient to create it.

Plaintiff maintains there are some factual discrepancies that favor his position. For example, the assailant did not use a knife blade. However, that is a minor difference given that the assailant still banged on the window with the hilt of a knife or some similar looking object aggressively enough to scare the victim. Whatever discrepancies Plaintiff highlights, they are insufficient to defeat probable cause. To make an arrest, an officer need not determine beyond a reasonable doubt that a suspect indeed has committed a crime. *Montgomery v. Chernak*, No. 18-cv-00217-REB-KLM, 2019 WL 979071, at *9 (D. Colo. Feb. 28, 2019); *U.S. v. Torres-Castro*, 374 F. Supp. 2d 994, 1011 (D.N.M. 2005). However, that is the standard that Plaintiff's theory of wrongdoing imposes on the Law Enforcement Defendants.

Although it is the state court's determination that is controlling, for the sake of argument, this Court reiterates that probable cause existed to arrest Plaintiff. It follows that probable cause likewise supports Plaintiff's post-arrest detention and the filing of criminal charges against him.

For that reason, Plaintiff does not state a plausible Section 1983 claim against any of the Law Enforcement Defendants. Without a constitutional violation, the Law Enforcement Defendants have qualified immunity.

For the above reasons, the Law Enforcement Defendants' Motion to Dismiss should be granted, and all claims against them be dismissed.

## II.    Prosecutorial Immunity

The existence of probable cause also defeats the malicious prosecution claims against the Prosecutor Defendants. However, there is another bar to Plaintiff's ability to sue them: absolute immunity. It is well-established law that prosecutors enjoy absolute immunity for anything they do in their role as advocates whether in initiating and presenting a criminal case. *Warnick v. Cooley*, 895 F.3d 746, 751 (10th Cir. 2018). None of the actions about which Plaintiff complains falls outside that protected continuum of prosecutorial conduct.

The Prosecutor Defendants' Motion to Dismiss should be granted, and all claims brought against them be dismissed.

## III.   Leave to Amend

The Court notes the Tenth Circuit's general rule to permit a *pro se* litigant leave to amend if it is all possible that pleading defects can be cured or a plausible claim for relief be stated. *Brandt v. Crone*, No. 19-cv-03103-MEH, 2021 WL 681441, at *6 (D. Colo. Feb. 22, 2021) (citing *Reynolds v. Shillinger*, 907 F.2d 124, 126 (10th Cir. 1990)). The Tenth Circuit also permits dismissal with prejudice and without leave to amend if the futility of such is obvious. *Fleming v. Coulter*, 573 F. App'x 765, 769 (10th Cir. 2014) (quoting *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 806 (10th Cir. 1999)). The nature of the pleading defects at issue in this case means that any attempt to amend the pleading would be futile. Both the application of the

23

*Rooker-Feldman* doctrine and the presence of absolute prosecutorial immunity present high bars to Plaintiff's ability to maintain his claims. Moreover, he fails to plead plausible claims for relief on the merits after four attempts. The Court does not see how Plaintiff can overcome the various pleading defects if given the opportunity to file a *Fourth* Amended Complaint.

## CONCLUSION

Plaintiff asserts his innocence to the charge of menacing or attempting to rob the victim on the night in question. Arrest, pre-trial detention, and criminal prosecution are of course difficult experiences, but the fact that they ended in a favorable way does not mean a constitution violation occurred. Probable cause justified those actions. Nor does the charges' dismissal (at the prosecutor's request) mean the lack of due process. To the contrary, it shows that Plaintiff received the benefit of due process protections. Moreover, the charges were dismissed before the trial stage, and consequently, he was not denied a fair trial.

Accordingly, the Court respectfully recommends[2] that the Motion to Dismiss [filed December 13, 2021; ECF 66] be **granted** and that all claims against the Prosecutor Defendants be dismissed with prejudice and without leave to amend. The Court recommends that the Motion to Dismiss [filed December 23, 2021; ECF 71] be granted and that all claims against the Law

---

2 Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a *de novo* determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are

Enforcement Defendants likewise be dismissed with prejudice and without leave to amend. Thirdly, to the extent the Court takes matters that he raises in it into consideration for present purposes, the Court recommends that Plaintiff's Motion Requesting the Court to Take Judicial Notice [filed May 16, 2022; ECF 102] be **granted**.

Respectfully submitted this 24th day of May, 2022, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge

---

accepted or adopted by the District Court. *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).